## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDERSON LOOKKIN, derivatively on behalf of Nominal Defendant CIT Group, Inc., <br><br>               Plaintiff, <br><br> v. <br><br> JEFFREY M. PEEK, GARY C. BUTLER, WILLIAM M. FREEMAN, SUSAN M. LYNE, JAMES S. MCDONALD, MARIANNE MILLER PARRS, TIMOTHY M. RING, JOHN R. RYAN, SEYMOUR STERNBERG, PETER J. TOBIN, and LOIS M. VAN DEUSEN, <br><br>               Defendants, <br><br> and <br><br> CIT GROUP, INC., <br><br>               Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 08-CV-7803 SAS <br> Judge  Scheindlin <br><br> ECF Case <br><br> JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Anderson Lookkin ("Plaintiff" or "Lookkin"), by his attorneys, submits this Verified Shareholder Derivative Complaint.

## NATURE OF THE ACTION

1.      This a shareholder derivative action brought by Plaintiff Lookkin for the benefit of Nominal Defendant CIT Group, Inc. ("CIT Group" or the "Company") against Defendants Jeffrey M. Peek, Gary C. Butler, William M. Freeman, Susan M. Lyne, James S. McDonald, Marianne Miller Parrs, Timothy M. Ring, John R. Ryan, Seymour Sternberg, Peter J. Tobin and

Lois M. Van Deusen for violations of their fiduciary duties owed to CIT Group from April 18, 2007 through March 31, 2008 (the "Relevant Period").[1]

2.      Throughout the Relevant Period, the Individual Defendants failed to disclose and misrepresented that the Company originated tens of millions of dollars in private (un-guaranteed) student loans to flight school students of Silver State Helicopters ("Silver State") that were highly unlikely to be repaid and would have to be written off and that as a result of the foregoing, the Company's statements about its financial well-being were lacking in any reasonable basis when made.

### JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different countries and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

4.      This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

5.      Venue is proper in this district pursuant to 28 U.S.C. §1391(a) because a substantial portion of transactions and wrongs complained of herein occurred in this district. Further Defendants either reside or participated in board of director meetings or maintain executive offices in this district and have received substantial compensation in this district by engaging in numerous activities and conducting business in this district. Further, CIT Group maintains its worldwide headquarters in this district.

---

[1] Because Defendants failed to take timely action to remedy the breaches of fiduciary duties occurred between April 18, 2007 and March 5, 2008, the Relevant Period continues through March 31, 2008, instead of ceasing on March 4, 2008, the day before the public became aware of the wrongdoing at the Company.

## PARTIES

6.      Plaintiff Lookkin, as set forth in the Verification, is and was during the Relevant Period, a shareholder of CIT Group.  Plaintiff is a citizen of

7.      Canada.

8.      Nominal Defendant CIT Group is a commercial and consumer finance company with its headquarters located in New York, New York.

9.      CIT is a global commercial and consumer finance company that provides financial products and advisory services to more than one million customers in over 50 countries across 30 industries. A leader in middle market financing, CIT has more than $70 billion in managed assets and provides financial solutions for more than half of the Fortune 1000. A member of the S&P 500 and Fortune 500, it maintains leading positions in asset-based, cash flow and Small Business Administration lending, equipment leasing, vendor financing and factoring. The CIT brand platform, Capital Redefined, articulates its value proposition of providing its customers with the relationship, intellectual and financial capital to yield infinite possibilities. CIT is incorporated in the State of Delaware and its principal executive offices are located at 505 Fifth Avenue, New York, NY 10017.

10.      Defendant Jeffrey M. Peek ("Peek") upon and information and belief is a citizen of the State of New York.  Peek, at all relevant times, served as the Chairman of the Board of Directors and Chief Executive Officer.  Peek is considered to be an employee of CIT Group.

11.      Defendant Gary C. Butler ("Butler") upon and information and belief is a citizen of the State of New Jersey.  Butler, at all relevant times, served as a member of the Nominating and Governance Committee and as a member of the Board of Directors.

12.     Defendant William M. Freeman ("Freeman") upon and information and belief is a citizen of the State of New Jersey.  Freeman, at all relevant times, served as Chairman of the Compensation Committee and as a member of the Board of Directors.

13.     Defendant Susan M. Lyne ("Lyne") upon and information and belief is a citizen of the State of New York.  Lyne, at all relevant times, served as a member of the Compensation Committee and as a member of the Board of Directors.

14.     Defendant James S. McDonald ("McDonald") upon and information and belief is a citizen of the State of New York.  McDonald, at relevant times, served as a member of the Audit Committee and as a member of the Board of Directors.

15.     Defendant Marianne Miller Parrs ("Parrs") upon and information and belief is a citizen of the State of Tennessee.  Parrs, at all relevant times, served as a member of the Audit Committee and as a member of the Board of Directors.  The Board of Directors has also determined that Parrs is an audit committee financial expert, as defined by Item 407 of Regulation of S-K and as required by Nasdaq Rule 4350(d).

16.     Defendant Timothy M. Ring ("Ring") upon and information and belief is a citizen of the State of New Jersey.  Ring, at all relevant times, served as a member of Compensation Committee and as a member of the Board of Directors.

17.     Defendant John R. Ryan ("Ryan") upon and information and belief is a citizen of the State of North Carolina.  Ryan, at all relevant times, served as Chairman of the Nominating and Governance Committee and as a member of the Board of Directors.

18.     Defendant Seymour Sternberg ("Sternberg") upon and information and belief is a citizen of the State of New York.  Sternberg, at all relevant times, served as a member of the Audit Committee and as a member of the Board of Directors.

Case 1:08-cv-07803-BSJ   Document 1   Filed 09/05/08   Page 5 of 36

19.     Defendant Peter J. Tobin ("Tobin") upon and information and belief is a citizen of the State of New York. Tobin, at all relevant times, served as Chairman of Audit Committee and as a member of the Board of Directors. The Board of Directors has also determined that Tobin is an audit committee financial expert, as defined by Item 407 of Regulation of S-K and as required by Nasdaq Rule 4350(d). Furthermore, Tobin serves as Lead Director of the Independent Directors Committee.

20.     Defendant Lois M. Van Deusen ("Van Deusen") upon and information and belief is a citizen of the State of New Jersey. Van Deusen, at all relevant times, served as a member of the Nominating and Governance Committee and as a member of the Board of Directors.

21.     Defendants Peek, Butler, Freeman, Lyne, McDonald, Parrs, Ring, Ryan, Sternberg, Tobin and Van Deusen are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of CIT Group's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these Defendants knew that the adverse facts specified herein had not been disclosed and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

1.      By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

2.      The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

3.      To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies and practices and controls of the Company.  By virtue of such duties the Individual Defendants were required to, *inter alia*:

      a.      exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

      b.      exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirement, and all contractual obligations, including acting only within the scope of its legal authority;

6

   c.   exercise good faith in taking action to correct any misconduct and prevent its recurrence when placed on notice of improper or imprudent conduct by the Company and/or its employees.

4.   The Individual Defendants, particularly the members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.

## BACKGROUND AND BRIEF OVERVIEW

5.   CIT Group, through its subsidiary Student Loan Xpress ("SLX"),[2] served as the preferred student loan lender of Silver State and Silver State was SLX's largest private student loan customer.  SLX originated both government-guaranteed student loans made under the Federal Family Education Loan Program ("FFELP") and non-federal guaranteed Private Education Loans.  Due to turmoil in the credit markets and a new federal law enacted in the third quarter of 2007 that slashed subsidies to the private companies that make government-backed student loans, CIT Group decided to exit the student lending industry. CIT Group discontinued offering private student loans during the fourth quarter of 2007 and further discontinued originating all student loans, including U.S. government guaranteed loans, in April 2008.

6.   CIT Group offers its loans to students attending both traditional schools and non-traditional schools. Traditional schools are typically institutions of higher education that are not-for-profit and offer bachelors and graduate degrees. Non-traditional schools are typically educational institutions that are for-profit and offer associate degrees and/or vocational, career or technical

---

[2] SLX had materially defective underwriting policies and approved virtually all the student loan applications submitted, after requiring little or no evidence of the borrowers' ability to pay the loan and approved loans without requiring documentation.

7

programs. For-profit schools are institutions that are run by private profit-seeking companies or organizations.

7.     The graduation rate at the non-traditional schools is much lower than the graduation rate at the typical schools. Graduation is critical to student loan lenders as graduates tend to earn more and experience lower rates of unemployment than non-graduates, both of which are key factors for borrowers being able to pay back their student loans. Additionally, the students attending non-traditional schools tend to have a lower tier credit quality and many of them fall into the category of subprime borrowers.

8.     The majority of CIT Group's private loans were made to non-traditional schools – and a large portion of these were made to students at Silver State. As of March 31, 2008, 65% of CIT Group's private student loans fell into this category. Furthermore, as of year-end December 31, 2007, CIT Group held $599.3 million of finance receivables related to private student loans; students attending Silver State held approximately $196 million of the outstanding student loans – over 32% of CIT Group's total private student loan balance was concentrated in this one non-traditional school. In light of the significant concentration of loans at this one institution, as well as the fact that Silver State was a non-traditional school, CIT Group should have been prompted to perform additional due diligence on Silver State.  Despite evidence that CIT Group's loan loss provisions for its borrowers attending Silver State were inadequate both prior to and at the start of the Relevant Period, CIT Group failed to adequately reserve for losses in its non-traditional portfolio.

9.     During the Relevant Period, Individual Defendants' statements were materially false and misleading because they failed to reflect tens of millions of dollars of bad loans the Company had made to students of Silver State, a helicopter flight training school headquartered in Las Vegas with locations throughout the U.S.

8

10.     The loans made to Silver State students were highly unlikely to be repaid because Silver State was nothing more than a pyramid scheme. Silver State was an unaccredited and unregulated helicopter academy. Silver State recruited unsuspecting students with seminars promising to train them in (18) eighteen months for high paying careers as helicopter pilots. Silver State then arranged for these students to obtain loans for the school's tuition – $70,000 for the 18-month course – from lenders, including CIT Group. However, by 2005, Silver State had become the largest private helicopter flight academy and one of the fastest growing companies in any industry in the United States, less than 10% of the matriculated students ever graduated within the (18) eighteen month timeline because the school lacked the equipment, instructors and other resources necessary to implement the program.

11.     Furthermore, unlike other flight training schools, Silver State promised graduates a job with the school after graduation – as flight instructors. Thus, the tuition of the students paid the salaries of the graduates who trained even more future instructors. A new student's tuition did not pay for their own instruction, but rather the school's immediate expenses. That student's instruction was then paid for by the tuition from future students, provided they enrolled, in a classic pyramid scheme. Further compounding its problems, Silver State did not have enough helicopters to train its ever-growing student body in 18 months. Once their 18 months was up, students were either expelled or required to borrow and pay more tuition.

12.     On January 31, 2008, Citibank refused to provide any further loans to Silver State students since they would likely never be repaid. The next day, on February 1, 2008, Silver State declared bankruptcy and shut its doors. Bankruptcy filings have revealed assets of $50,000 and liabilities in the tens of millions of dollars.

13.    During the Relevant Period, CIT Group had originated private (non-government guaranteed) loans to students at Silver State, which totaled approximately $196.8 million in principal and accrued interest as of December 31, 2007.  The Company's reserve for credit losses at June 30, 20089, includes $126.5 million relating to this exposure.  After the school filed for bankruptcy, and ceased operations, lawsuits, including four putative class action lawsuits, have been filed against SLX and other lenders alleging, among other things, violations of state consumer protection laws.  In addition, several other attorneys who purport to represent student borrowers have contacted SLX and threatened litigation if their clients do not receive relief with respect to their debts to SLX.  The Attorneys General of several states have informed SLX that they are reviewing the impact of the pilot training school's bankruptcy on the student borrowers and any possible role of SLX.  CIT Group claims to be currently evaluating each of the pending and threatened lawsuits and is cooperating in each of the Attorneys General inquiries.

14.    During the Relevant Period, the Individual Defendants knew or should have known that these loans were unlikely to be repaid and that they should have been written off.  By failing to do so, Individual Defendants rendered CIT Group's financial statements materially false and misleading.

## SUBSTANTIVE ALLEGATIONS

15.    During the Relevant Time Period, Defendants publicly issued false and misleading statements and failed to disclose material facts necessary to make Defendants' statements not false and misleading. Specifically, CIT Group's public financial statements failed to account for tens of millions of dollars in loans to Silver State, which were highly unlikely to be repaid and should have been written off.

16.     The Relevant Period begins on April 18, 2007.  On this day, the Company issued

a press release entitled "CIT Reports Record First Quarter Results; Strong Revenue and Origination

Growth, Moderating Expense Trends and Low Net Charge-Offs."  Therein, the Company, in

relevant part, stated:

> CIT Group Inc. today reported diluted earnings per share (EPS) of $1.37 for the
> quarter, up from $1.12 for the 2006 quarter.  Net income available to common
> shareholders was $271.4 million and $229.7 million for the current and prior year
> quarters.
>
> Excluding noteworthy items, diluted EPS of $1.30 ($257.8 million net income
> available to common shareholders) for the quarter improved 15% from $1.13 ($230.6
> million) in 2006. On this basis, return on average common equity was 14.8%, up
> from 14.2% last year.
>
> The current quarter noteworthy items increased EPS by $0.07 including a tax expense
> reduction of $20.6 million due to the release of certain international tax reserves
> ($0.10 diluted EPS increase) and an interest expense increase of $14.8 million due
> to certain costs related to early extinguishments of high cost debt ($0.04 diluted EPS
> decrease). . . .
>
> ***"CIT is off to a solid start in 2007 with our operating EPS increasing 15% from
> a year ago," said Jeffrey M. Peek, Chairman and Chief Executive Officer of CIT.
> "The key drivers of our success have been broad-based and are rooted in the
> growth strategies and initiatives that are building CIT's future.  Our sales force
> investment continues to pay dividends.  Top-line revenue grew 14% as a result of
> our 24% increase in new business volume.***

17.     On April 18, 2007, on the Company's Q12007 earnings conference call, Defendant

Peek made the following statements:

> Second, in conjunction with our own internal review of Student Loan Xpress, a business
> we acquired in 2005, and under review by the New York Attorney General's Office, we
> took decisive action and placed three senior SLX ["Student Loan Xpress"] executives
> on administrative leave. Randy Chesler, President of CIT Consumer Finance, has
> assumed interim oversight of the organization.
>
> *     *     *
>
> Laura Kaster – Sander O'Neill – Analyst

11

I have one question on student lending and then a follow-up on your CLO business. *So can we infer from your comments that you are definitively not selling your student lending business despite the premium that Sallie Mae received for their LBL?*

Peek: Our process on evaluating these businesses really hasn't changed much. We continue to review them on an annual basis as to whether they can get to our corporate hurdle rates and we try to tack back to that on a continuous basis. *I think, as you know and a number of other close observers of the Company, SLX has really done a terrific job in terms of growth. They've really exceeded all of our growth objectives.* We bought it two years ago. The Company is more than twice the size of when we bought it, so we continue to review all our businesses and are very committed to fixing or divesting those that we don't think can get through the corporate hurdle rate within a reasonable period of time, and that will really apply to SLX just the same way it applies to all of the other business.

18.    On April 24, 2007, at the AFSA 7th Finance Industry Conference for International Fixed-Income Investors, Glen Votek, Executive Vice President and Treasurer made the following statements:

Unidentified Company Participant

\*    \*    \*

And then finally our student lending business, which is another one that's been in the news for a couple of reasons.  One, on the legislative front, you've all heard about some of the legislation being contemplated in Washington around changes to the program, whether it be changing the level of guarantee, or changing the spread that can be offered to the obligors. So there's a number of uncertainties in this business. This is a portfolio of a business that we acquired a couple years ago. *We have been quite pleased with the performance of this business; we have grown it to more than twice the size it was when we first acquired it. It continues to make good progress in generating the returns that we're expecting; so those metrics are quite positive.*

\*    \*    \*

*But we also take our governance practices very seriously, and among the areas of investigation, there was a question around a few of our executives prior to us acquiring the business that related to an offering of shares on a private basis. And, again, we view integrity and trust very highly; we think it's critical to CIT and the way we conduct business, and we've put those three individuals on a leave of absence pending our own internal investigation. So, again, I just want to reinforce the fact that integrity is critically important to CIT and we hold ourselves to very high standards in that regard.*

19.     On May 8, 2007, the Company filed a Form 10-Q with the SEC, which stated in relevant part:

Student Loan Xpress, Inc. ("SLX"), a subsidiary of CIT, is engaged in the student lending business. During the quarter ended March 31, 2007, in connection with investigations into the relationships between student lenders and the colleges and universities that recommend such lenders to their students, *CIT and/or SLX have received requests for information from the Attorneys General of the State of New York and several other states and federal government bodies.* CIT engaged outside legal counsel to conduct a review of the business practices that are the subject of the investigations and to support CIT in responding to the information requests. The internal review is ongoing, and CIT is fully cooperating with the investigations.

\*   \*   \*

Student Lending (Student Loan Xpress)

*The Consumer Finance student lending portfolio, which is marketed as Student Loan Xpress, totaled $9.9 billion at March 31, 2007, representing 13% of owned and 12% of managed assets. Loan origination volumes were $1.8 billion and $1.6 billion for the quarters ended March 31, 2007 and 2006.* Student Loan Xpress has arrangements with certain financial institutions to sell selected loans and works jointly with these financial institutions to promote these relationships.

20.     On May 10, 2007, CNBC.com issued the following article on the Company entitled,

"CIT Group Settles with New York Over Student Loan Unit," which stated in relevant part:

New York Attorney General Andrew Cuomo's office said it reached a settlement with CIT Group and CIT's Student Loan Xpress unit arising from the state's investigation of abuses in the U.S. student loan-business. The New York-based commercial consumer lender agreed to pay $3 million into a fund that will educate students about financial aid, reform its business practices and assist the state in its investigation of certain lending officials who engaged in highly questionable practices," Cuomo said in a statement.

\*   \*   \*

The allegations arose from Cuomo's probe of the U.S. student-loan business, an $95 billion a year industry in which conflicts of interest can result from undisclosed financial relationships between lenders and colleges.  Cuomo has argued that lenders used payments and perks to curry favor with schools and school officials in order to win the coveted "preferred lender" designation. Nine out of ten students choose a lender recommended by their school.  CIT is the

13

seventh bank or student-loan company to reach an agreement with New York, with the highest fine to date.

*   *   *

Cuomo's office said it found that Student Loan Xpress had provided meals, entertainment and gifts to school officials.   Student Loan Xpress sponsored advisory boards of financial aid officers and funded free trips to meetings.  New York investigators said Student Loan Xpress provided free staff to financial aid offices, free printing services and training seminars for aid officers and sponsored school events.   Some financial aid officers also received consulting fees from serving on Student Loan Express' advisory board.

21.    On July 18, 2007, the Company issued a press release entitled "CIT Reports Second Quarter Results; Exiting Home Lending Business," which stated in relevant part:

> CIT Group Inc. today reported a diluted loss per share of $0.70 for the 2007 quarter, versus $1.16 of earnings per share for the 2006 quarter. The net loss attributable to common shareholders was $134.5 million for the current quarter, versus $236.0 million income for the prior year quarter.

22.    On July 18, 2007, on the Company's Q2 2007 earnings conference call, Defendant Peek made the following statements:

> ***Finally, in consumer small business lending, the performance and growth of our student loan business has been overshadowed by the uncertainty of pending legislation on Capitol Hill.*** As the fog lessens there, we're closely monitoring the situation and evaluating how well our model would perform in the face of shifting industry dynamics. ***In the immediate future, we expect this business to have a solid second half of the year. As typically their third quarter is the strongest origination quarter and the fourth quarter benefits from increased home loan sales.***

*   *   *

> Chris Brendler Stifel Nicolaus – Analyst
>
> One final question.  If you decide to exit the student lending business next, would we see anywhere near as big an impact on your earnings?
>
> [Leone:] You mean in terms of the operating earnings contribution?  I would say no.
>
> Chris Brendler Stifel Nicolaus – Analyst And the write-down?
>
> [Leone:] We didn't evaluate that. As I said before, we have about $300 million of goodwill and I think as Jeff said, the business is twice as big as it was when we bought it.

14

Chris Brendler Stifel Nicolaus – Analyst

But there's almost no credit risk in that business.

[Leone:]  That's right.  And all those loans, the historical book is at the old late or the grandfathered rate, so to speak.

23.     On August 7, 2007, the Company filed a Form 10-Q with the SEC, which stated in relevant part:

Student Loan Investigation

Student Loan Xpress, Inc. ("SLX"), a subsidiary of CIT, is engaged in the student lending business. In connection with investigations into (i) the relationships between student lenders and the colleges and universities that recommend such lenders to their students, and (ii) the business practices of student lenders, CIT and/or SLX have received requests for information from several state Attorneys General and several federal governmental agencies. CIT's outside legal counsel conducted a review of the business practices that are the subject of the investigations and has supported CIT in responding to the information requests. *In May, 2007, CIT entered into an Assurance of Discontinuance (the "AOD") with the New York Attorney General (the NYAG"), pursuant to which CIT contributed $3.0 million into a fund established to educate students and their parents concerning student loans and agreed to cooperate with the NYAG's investigation, in exchange for which, the NYAG agreed to discontinue its investigation concerning certain alleged conduct by SLX. The internal review is ongoing, and CIT is fully cooperating with the remaining investigations.*

\*   \*   \*

*Student lending delinquencies were $487.7 million (5.03%) at June 30, 2007, up from $452.9 million (4.77%) at March 31, 2007 and $400.1 million (4.71%) at December 31, 2006. The higher delinquency in the student loan portfolio is not indicative of potential loss due to the underlying U.S. government guarantee of 97%98% of the remaining principal amount.*

Student Lending (Student Loan Xpress)

The Consumer Finance student lending portfolio, which is marketed as Student Loan Xpress, totaled $10.3 billion at June 30, 2007, representing 14% of owned and 13% of managed assets.  Loan origination volumes were $1.3 billion for both quarters ended June 30, 2007 and 2006 and $3.2 billion and $2.9 billion for the six months then ended. Student Loan Xpress has arrangements with certain financial

institutions to sell selected loans and works jointly with these financial institutions to promote these relationships.

24.     On September 11, 2007, at the Lehman Brothers 5th Annual Services Conference,

Defendant Peek made the following statements:

> *Let me just hit on student lending here. . . . Operationally, the business is in the midst of its strongest operating quarter. We had record originations in July and the school channel in August. We were up 49% over loans originated in the school channel in 2006.*

25.     On October 17, 2007, the Company issued a press release entitled "CIT Reports Third

Quarter Results; Quarterly Financial Highlights," which stated in relevant part:

> CIT Group Inc. today reported diluted net loss per share of $0.24 for the third quarter of 2007, due to the home lending charge, versus $1.44 of earnings per share for the 2006 quarter. Net loss attributable to common shareholders was $46.3 million for the current quarter, versus net income of $290.8 million last year.

26.     On October 17, 2007, on the Company's Q3 2007 earnings conference call,

Defendant Peek made the following statements:

> [Jeffrey M. Peek:] *And finally, an update on student lending. Our team did a great job delivering record new business volume in what is seasonally the most important quarter of the year. School channel originations were up 17% from a year ago, and that is important because with the new legislation, in-school originations are, far and away, the most profitable for us.*

27.     On November 5, 2007, the Company filed a Form 10-Q with the SEC, which stated in

relevant part:

> Student Lending (Student Loan Xpress)
>
> The Consumer Finance student lending portfolio, which is marketed as Student Loan Xpress, totaled $11.5 billion at September 30, 2007, representing 14.9% of owned and 13.7% of managed assets. Loan origination volumes were $1.8 billion for the quarters ended September 30, 2007 and 2006 and $5.0 billion and $4.7 billion for the nine months then ended. Student Loan Xpress has arrangements with certain financial institutions to sell selected loans and works jointly with these financial institutions to promote these relationships.

28.     On December 11, 2007, at the Goldman Sachs Financial Services Conference,

Defendant Peek made the following statements:

> Consumer – just to round it out, *we are redefining our student lending strategy in light of the new legislation. We have effectively exited the consolidation loan and the private loan channels and we're concentrating on the government guaranteed school channel. In that channel, we really have experienced good success and good growth and we'll continue to evaluate our strategy and the competitive landscape as that becomes a little clearer.*

29.     On January 17, 2008, the Company issued a press release entitled "CIT Reports

Fourth Quarter Results; Quarterly Financial Highlights," which stated in relevant part:

> *CIT Group Inc. today reported a net loss of $130.7 million, or $0.69 per share, for the fourth quarter of 2007, reflecting the impact of several noteworthy items discussed below, versus net income of $259.3 million, or $1.28 of diluted earnings per share, for the 2006 quarter.* For the full year, the net loss attributable to common shareholders was $111.0 million for 2007, versus net income of $1,015.8 million last year.

> *"We were not pleased with our reported loss this quarter, which primarily related to charges on our home lending and student lending businesses – two sectors that have recently experienced significant change."*

> \*         \*         \*

> Fourth quarter results include the following previously disclosed items:

> \*         \*         \*

> *A $313 million goodwill and intangible asset impairment charge related to the Company's student lending business, reflecting decreased market valuations for student lending businesses, and lower profit expectations as a result of higher funding costs (decrease to EPS of $1.59) ... .*

30.     On February 8, 2008, at the Credit Suisse Group Financial Services Forum,

Defendant Peek made the following statements:

> We did, however, as I think many of you know, report a loss for the year due to the charges we took in our consumer businesses. About $1.5 billion against our home lending portfolio and over $300 million in writing-off the goodwill and intangibles from our student lending acquisition in 2005.

> Despite, certainly, in the second half of 2007, despite a lot of the market dislocation, we clearly stayed open for business with our customers.  As the year progresses, we

went through 2007, we started to significantly deemphasize our consumer businesses. In August, we closed our origination network for home lending and as we got into the new legislation in student lending in the fourth quarter, we changed our business platform just to conform to the change of focus in the new legislation.

*In terms of student lending, let me just give you a brief update on that. We wrote off all the goodwill and the intangibles, a little over $300 million in the fourth quarter. We have effectively stopped making new consolidation in private loans. We're still making the FFELP loans in the school channel. They're not as profitable as they were six months ago. Here, we are going to continue to monitor the competitive and the legislative landscape and look at our strategic alternatives over time.*

*Our largest industry concentration is student lending, where 95% of the assets are FFELP loans guaranteed by the government as to 97% principal.*

31.    On February 29, 2008, the Company filed a Form 10-K with the SEC, which stated in

relevant part:

*Consumer delinquency increased in 2007 driven by Student Lending. Delinquencies on student loans for which there is a 97% government guarantee totaled $569.1 million (5.23%) and $399.0 million (4.88%) at December 31, 2007 and 2006. Higher delinquency in this component of our student loan portfolio is not indicative of potential loss due to the underlying U.S. government guarantee on the majority of the loan balance. Delinquencies on non-government guaranteed private loans totaled $12.7 million (2.03%) and $1.1 million (0.35%) at December 31, 2007 and 2006.*

Approximately $445 million (75%) of the private loan portfolio is not yet in repayment status, which begins upon graduation, or when students no longer attend the school. As more loans enter repayment status, it is possible that we will experience increasing delinquencies in the portfolio.

Student Lending (Student Loan Xpress)

The Consumer Finance student lending portfolio, which is marketed as Student Loan Xpress, totaled $11.6 billion at December 31, 2007, representing 15.1% of owned and 13.9% of managed assets. Loan origination volumes totaled $5.9 billion in 2007, $6.3 billion in 2006, and $2.4 billion for the period of CIT ownership beginning in February 2005. *Student Loan Xpress has arrangements with certain financial institutions to sell selected loans and works jointly with these financial institutions to promote these relationships.* These sales are held on-balance sheet and are further described in "On-balance Sheet Securitization Transactions."

*The Company ceased originating private (un-guaranteed) student loans in late 2007 based on an evaluation of the return and risk characteristics of this student lending product, but has continued to fund pre-existing loan commitments. In February 2008, a private pilot training school filed bankruptcy. Our student lending business had originated private (un-guaranteed) loans to students of the school, which totaled approximately $196 million in total principal and accrued interest as of December 31, 2007. We ceased originating new loans to students of this school in mid-2007. Approximately $17 million of the total loans represents loans to students who have completed their education (loans in "repayment"); the remainder is to students who have not yet completed their training.* Loans in repayment to students of this school that were past due loans 60 days or more were approximately $2.0 million at December 31, 2007. Collect-ability of the outstanding principal and interest balance of loans that have both reached, and have not yet reached repayment status, will depend on a number of factors, including the student's current ability to repay the loan, whether a student has completed the licensing requirements, whether a student can complete any remaining education requirements at another institution (including making further tuition payments and accessing previous education records) and satisfy any remaining licensing requirements.

Management is currently evaluating the collect-ability and projected cash flows related to these loans. Given that the loans are unsecured and that uncertainties exist regarding collection, management currently expects that additional reserves may be required in 2008 in connection with these loans.

32.     On March 6, 2008, Keefe, Bruyette & Woods issued the following analyst report on

the Company:

(CIT, $20.36, Outperform, Target: $39.00)

CIT: *Adjusting Q108 Estimate for Likely Student Loan Write-down*

**Event** – As a follow-up to our initial thoughts published on March 3, we are lowering our Q108 EPS estimate to $0.08 from $0.76 to reflect our view that the company will have to write-down a significant portion of its private student loan portfolio.

33.     On March 6, 2008, *Associated Press* published an article entitled "CIT shares

plunge on potential write-off," which stated in relevant part:

Shares in CIT Group Inc. plunged Thursday after an analyst slashed its earnings target for the lender on concerns that the company will take a massive charge to write down its student loan portfolio.

CIT shares lost $4.50, or 22.1 percent, to $15.86 Thursday.  Earlier in the session the stock hit a 52-week low of $15, well below the previous mark of $19.05.

Keefe, Bruyette & Woods analyst Sameer Gokhale now expects the company to earn 8 cents per share in the first quarter instead of his previous estimate of 76 cents per share.

*"We believe there is increased risk that the company will have to charge off $179 million of private student loans made to students of a flight school which recently filed for bankruptcy," he wrote in a note to investors.*

He said the students did not receive their licenses and are less likely to be able to repay the loans. Because the loans are private, they cannot be written off in personal bankruptcy, he said.

34.     As now revealed, the Company's earnings press releases, as well as its SEC filings portraying strong financial results, were materially false and misleading. As a result of these materially false and misleading statements and failures to disclose material facts, CIT Group's common stock traded at artificially inflated prices during the Relevant Period. Individual Defendants materially misled the investing public, thereby inflating the price of CIT Group's common stock, by publicly issuing false and misleading statements and failed to disclose material facts necessary to make Defendants' statements, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations as detailed herein.

35.     As a result of these disclosures, CIT Group's stock price dropped from $20.36 to $15.86 the next day. This decrease in CIT Group's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

## GAAP VIOLATIONS

36.     In order to inflate the price of CIT Group's stock, Individual Defendants caused the Company to falsely report its results for the first three quarters of 2007 by failing to adequately

accrue its loan loss provisions with respect to its Silver State loan portfolio which overstated the Company's net income.

37.     The results for the first three quarters of 2007 were included in Forms 10-Q filed with the SEC. The results were also included in press releases disseminated to the public.

38.     These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of CIT Group's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

39.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

40.     With respect to accounting for contingencies, GAAP, as set forth in FASB Statement of Financial Accounting Standard No. 5, *Accounting for Contingencies,* ¶8, states:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:
>
> a.     Information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b.     The amount of loss can be reasonably estimated.

21

(Emphasis in original, footnote omitted.)

41.     In violation of GAAP, CIT Group failed to provide an adequate reserve for its loan loss provision related to its Silver State loan portfolio. Despite evidence that loans provided to students attending Silver State schools would likely never be paid back, the Company failed to provide an adequate reserve for its borrowers attending Silver State schools.

42.     Ultimately, CIT Group was forced to take a charge to increase its loan loss provision by $111.50 million in the first quarter of 2008 in order to cover actual and expected loan losses specifically related to its Silver State portfolio, which stood at $194.6 million at March 31, 2008. The Company may be required to take additional charges in the future related to Silver State.

43.     Due to these accounting improprieties, the Individual Defendants presented the Company's financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

        (a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶110);

        (b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

        (c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

        (d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts

wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1,1150);

(e)  The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)  The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.    That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶1158-59);

(g)  The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, 95, 97).

44.    Further, the undisclosed adverse information concealed by Individual Defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## DEMAND WOULD BE FUTILE

45.    All of these directors face a substantial likelihood of liability in this action because they knew their public statements in press releases and SEC filings were materially false and misleading as alleged above; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents.  These directors either knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation.

46.    Plaintiff brings this action derivatively in the right and for the benefit of CIT Group to redress injuries suffered by CIT Group as a result of the breaches of fiduciary duty by the Individual Defendants.

47.    Plaintiff will adequately and fairly represent the interests of CIT Group and its shareholders in enforcing and prosecuting its rights.

48.    Plaintiff is owner of CIT Group common stock and was an owner of CIT Group common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

49.    Derivative Plaintiff has not made a demand on the board of directors to bring these causes of action because such a demand would be futile.  The board of directors currently consist of eleven members:  Jeffrey M. Peek (Chairman of the Board and CEO), Gary C. Butler (member of Nominating and Governance Committee), William M. Freeman (Chairman of Compensation Committee), Susan M. Lyne (member of Compensation Committee), James S. McDonald (member of Audit Committee), Marianne Miller Parrs (member of Audit Committee), Timothy M. Ring (member of Compensation Committee), John R. Ryan (Chairman of

Nominating and Governance Committee), Seymour Sternberg (member of Audit Committee), Peter J. Tobin (Chairman of Audit Committee) and Lois M. Van Deusen (member of Nominating and Governance Committee).  As detailed below, each of the directors are subject to substantial liability on these derivative claims and are therefore in no position to render a disinterested judgment on whether the Company should bring them, and/or lack sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

### Additional Likelihood of Substantial Liability for the Audit, Compensation and Nominating and Governance Committee Defendants

50.    Defendants Tobin (Chair), Parrs, Sternberg and McDonald have enhanced responsibilities as members of the Company's Audit Committee.  That Committee was charged with direct responsibility for the appointment, compensation and oversight of the work of the outside auditors; and the Audit Committee Charter imposed a detailed set of responsibilities and powers in connection with financial reporting and financial controls.

51.    Given the size, scope, and blatancy of the financial misrepresentations described above, the Audit Committee members either knew of the financial manipulations or turned a blind eye to them.  Such conduct is also not protected by the business judgment rule and exposes these Individual Defendants to a substantial threat of liability in this action.

52.    Defendants Freeman (Chair), Lyne and Ring are members of the Board's Compensation Committee.  In those positions, they approved annual cash incentive and equity awards and stock option, retirement, severance, deferred compensation and compensation plans for executives, pursuant to which millions of dollars were and will be paid out by the Company based on grossly inflated financial results.

53.    Defendants Ryan ("Chair"), Sternberg and Van Deusen are members of the Board's Nominating and Governance Committee. That Committee was charged with the direct responsibility, *inter alia*, of recommending to the Board qualified candidates to fill positions on the Board and the compensation and benefits for directors; overseeing the evaluation of the Board, its committees, members and corporate guidance.

54.    Defendant Peek is the Company's current Chairman of the Board and Chief Executive Officer. His principal occupation is his employment with CIT Group. In 2007, the Company paid Peek, *inter alia*, $800,000.00 in salary, $4,231,733.00 in stock awards, $2,983,871.00 in option awards, for a total compensation of $9,049,733.00. Furthermore, Peek was chosen to participate in the Company's retention program in early 2008. The retention program provides a grant of restricted cash units that vest over a two year period. Peek received 150,000 restricted cash units. For these reasons, he lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

55.    Defendant Butler lacks independence based on his position as President and Chief Executive Officer of Automatic Data Processing, Inc. ("ADP"). ADP is one of the world's largest providers of business outsourcing solutions and provides CIT Group with employer-related business solutions, including, but not limited to, payroll, benefits, human resource and other business process management services. ADP will inevitably receive compensation for its services, and such compensation will provide outside benefits to Butler.[3] Because Butler is in a position to receive compensation from CIT Group's relationship with ADP, he lacks sufficient

---

[3] CIT Group's Definitive Proxy Statement filed March 25, 2008, briefly mentions that ADP provides services to CIT; however it fails to disclose specific details regarding the arrangement between CIT and ADP.

independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

56.     Defendant Sternberg lacks independence based on his position as Chairman of the Board and Chief Executive Officer of New York Life Insurance Company ("NYLIC"). NYLIC provides CIT Group with insurance and investment products and services.  NYLIC will inevitably receive compensation for its services, and such compensation will provide outside benefits to Sternberg.[4]  Because Sternberg has conflicting loyalties due to his connection with NYLIC, he lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

57.     Defendants Peek, Ryan, Tobin, Sternberg, and Freeman lack independence based on their current or previous influential positions with the following colleges and universities with respect to overseeing lender participation, recommendation and/or approval to students and parents who borrow from certain financial institutions:

- o   Peek: (1) Trustee, Teachers College, Columbia University; and (2) Chairman of the Advisory Council, Bendheim Center for Finance, Princeton University;

- o   Ryan: (1) President, SUNY Maritime College; and (2) Chancellor, State University of New York

- o   Tobin:  (1) Dean Tobin College of Business, St. John's University, and (2) Special Assistant to the President, St. John's University;

- o   Sternberg: (1) Chairman, Business Leadership Council, City University of New York; and (2) Trustee, Springfield College; and (3) Board of Directors, Northeastern University; and

- o   Freeman: (1)  Trustee, Drew University.

---

[4]  CIT Group's Definitive Proxy Statement filed March 25, 2008, briefly mentions that NYLIC provides services to CIT; however it fails to disclose specific details regarding the arrangement between CIT and NYLIC.

The actual and/or apparent relationships between CIT Group and the colleges and universities that the aforementioned Individual Defendants are or were associated with creates a conflict of interest on behalf of the Individual Defendants. In 2007, as discussed above, the Company paid Peek $9,049,733.00 in total compensation. In 2007, the Company paid Freeman $60,000.00 in an annual retainer, $25,051.00 in stock awards and $41,498.00 in option awards for a total compensation of $126,549.00. In 2007, the Company paid Ryan $60,000.00 in an annual retainer, $25,085.00 in stock awards and $46,483.00 in option awards for a total compensation of $131,566.00. In 2007, the Company paid Sternberg $60,000.00 in an annual retainer, $27,853.00 in stock awards and $35,223.00 in option awards for a total compensation of $123,674.00. In 2007, the Company paid Tobin $60,000.00 in an annual retainer, $27,853.00 in stock awards and $46,483.00 in option awards for a total compensation of $134,334.00. The Individual Defendants' influential associations with institutions of higher learning while receiving compensation from CIT Group creates numerous appearances of impropriety. Because Peek, Ryan, Tobin, Sternberg, and Freeman's loyalties would not be exclusive to the Company and its shareholders, each of them lack sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

58. Moreover, Defendants Peek and McDonald have a close personal relationship, which creates a level of disinterestedness. Peek and McDonald are both alumni of Harvard University and this association is believed to have fostered a personal relationship which resulted in McDonald being supported and referred by Peek to the Nominating and Governance Committee for recruitment as a director. In accordance with Peek's support and referral, the Nominating and Governance Committee subsequently recruited and recommended McDonald as

a nominee for a director position in 2007. Given that Peek and McDonald have a pattern of securing each other with professional positions, their relationship raises serious doubt about whether Peek and McDonald would ever approve of a course of action that implicates the other. Because their loyalties would not be exclusive to the Company and its shareholders, Peek and McDonald lack sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

59.   Plaintiff has not made any demand on the shareholders of CIT Group to institute this action since demand would be a futile and useless act for the following reasons:

   a.   CIT Group is a publicly held company with approximately 285.4 million shares outstanding, and thousands of shareholders;

   b   Making demand on such a number of shareholders would be impossible for Plaintiff, who has on way of finding out the names, addresses or phone numbers of all the shareholders; and

   c.   Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

60.   CIT Group has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above. Such expenditures will include, but are not limited to:

   a.   Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts;

   b.   Costs related to defending various lawsuits filed against CIT Group;

   c.   Costs related to several governmental investigations, including the New York Attorney General's investigation into (i) the relationships between student lenders and the colleges and universities that recommend such lenders to their students, and (ii) the business practices of student lenders.

61.     Moreover, Derivative Plaintiff has not made a demand on the board of directors to bring these causes of action because such a demand would be futile and useless act for the following additional reasons:

a.      Individual Defendant Peek is not an independent director of CIT Group. As noted in (¶) paragraph 54, Peek is beholden to CIT Group because of his employee status with CIT Group. Because of this, it is reasonable to conclude that he would not authorize suit against the Individual Defendants. Therefore, demand upon Individual Defendant Peek is futile.

b.      Individual Defendant Butler is not a sufficiently independent director of CIT Group. As noted in (¶) paragraph 55, Butler is President and CEO of ADP. CIT Group has a business agreement with ADP and receives business outsourcing services from ADP. Therefore, demand upon Individual Defendant Butler is futile.

c.      Individual Defendant Sternberg is not a sufficiently independent director of CIT Group. As noted in (¶) paragraph 56, Sternberg is Chairman and CEO of NYLIC. NYLIC provides CIT Group with insurance and investment products and services. Therefore, demand upon Individual Defendant Sternberg is futile.

d.      Individual Defendants Peek, Ryan, Tobin, Sternberg, and Freeman are not sufficiently independent directors of CIT Group. As noted in (¶) paragraph 57, Individual Defendants Peek, Ryan, Tobin, Sternberg and Freeman hold or previously held influential positions with numerous colleges and universities that enabled CIT Group to provide student lending services to their students. Therefore, demand upon Individual Defendants Peek, Ryan, Tobin, Sternberg and Freeman is futile.

e.      Individual Defendants Peek and McDonald are not independent directors of CIT Group. As noted in (¶) paragraph 58, Peek and McDonald have a close personal relationship that renders it reasonable to conclude that they would not authorize suit against each other. Therefore, demand upon Individual Defendant Peek and McDonald is futile.

f.      Individual Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.

g.      The Individual Defendants of CIT Group, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise

30

accounting practices. Each of the Individual Defendants exhibited a sustained and systematic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness.

h. In order to bring this suit, a majority of the directors of CIT Group would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

i. The acts complained of constitute violations of the fiduciary duties owed by CIT Group's officers and directors and these acts are incapable of ratification.

j. CIT Group has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for CIT Group any part of the damages CIT Group suffered and will suffer thereby.

k. The actions of the directors has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands.

l. Any suit by the directors of CIT Group to remedy these wrongs would likely expose the Individual Defendants and CIT Group to further violations of securities laws which could result in additional civil actions being filed against one or more of the Individual Defendants thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves.

62. Making demand on all shareholders would also force Plaintiff to incur huge expenses, assuming all shareholders could even be individually identified.

## FIRST CAUSE OF ACTION

### Against Individual Defendants for Breach of Fiduciary Duty

63. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth full herein.

64.     The Individual Defendants owed and owe CIT Group fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe CIT Group the highest obligation of good faith, fair dealing, loyalty and due care.

65.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

66.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

67.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, CIT Group has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

68.     Plaintiff, on behalf of CIT Group, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants for Abuse of Control

69.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

70.     The Individuals Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CIT Group, for which they are legally responsible.

71.     As a direct and proximate result of the Individual Defendants' abuse of control, CIT Group has sustained significant damages.

72. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

73. Plaintiff, on behalf of CIT Group, has no adequate remedy at law.

### THIRD CAUSE OF ACTION

**Against the Individual Defendants for Gross Mismanagement**

74. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

75. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of CIT Group in a manner consistent with the operations of a publicly held corporation.

76. As direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, CIT Group has sustained significant damages in excess of millions of dollars.

77. Plaintiff, on behalf on CIT Group, has no adequate remedy at law.

### FOURTH CAUSE OF ACTION

**Against the Individual Defendants for Waste of Corporate Assets**

78. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

79. As result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused CIT Group to waste valuable corporate

assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

80.     As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

81.     Plaintiff, on behalf of CIT Group, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against the Individual Director Defendants for Unjust Enrichment

82.     Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

83.     By their wrongful acts and omission, the Individual Defendants were unjustly enriched at the expense of and to the detriment of CIT Group.

84.     Plaintiff, as a shareholder and representative of CIT Group, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.     Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.     Extraordinary equitable and/or injunctive  relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching,

impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C. Awarding to CIT Group restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: September 4, 2008                    Respectfully Submitted,

William B. Federman, Esq., WF 9124
FEDERMAN & SHERWOOD
10205 North Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Fax: (405) 239-2112
wbf@federmanlaw.com

Attorneys for Plaintiff

## **VERIFICATION**

I, _ANDERSON LOOKKIN_ declare that I have reviewed the Complaint ("Complaint") prepared on behalf of CIT Group, Inc., and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of CIT Group, Inc. common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

11th Aug, 2008
Date

_____
(Signature of Investor)

I:\Pending\CITGroup\VerificationCIT.doc